IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:15-cr-12 |
| | ) | |
| JOHN F. BOSLET | ) | |

## MEMORANDUM IN AID OF SENTENCING

## I.   INTRODUCTION:

John Boslet, the youngest of 7 children and 8 years younger than the sibling before him, often feels he should never have been born.



*John Boslet school photo, undated.*

As a child, John served as an altar boy at Holy Rosary Church in Altoona. When he was 13 years old, a priest tried to initiate a sexual relationship with him. He told no one.  John experienced Catholicism to teach that suffering was a good thing.



*John Boslet with his parents, undated.*

Many in John's family struggled with mental health.  His parents, Clair and Artie Boslet, were loving and supportive of him but it was also apparent they suffered. Clair, was shy, didn't drive, was prone to depression, and often said she felt that "life was hell." Artie had anxiety and worried about everything, especially confession. Artie's sister had depression and anxiety. Artie's mother was hospitalized for hysteria.  This was the environment in which John was raised.

Like his family members, John also struggled. He attended a small Catholic school and, in the first grade, he told a girl he liked her. In response, she told him he was "gross" and "ugly." A seemingly begnign comment at first, that evovled - the whole class ridiculed him and, as his classmates remained the same through graduation, he was called "Ugly" throughout his school career.  John, who was naturally shy and quiet, took the repeated bullying to heart. He graduated from Bishop Guilfoyle Catholic High School in 1983.

John's father was a Marine and John's brother, Lonnie, was in the Navy. Like them, John enlisted in the United States Army where he served honorably for

thirteen years, from 1985 – 1998. He was stationed in Germany, Korea and Bosnia. While in Germany, John was continuously threatened, publicly humiliated, and sexually assaulted by an older male sergeant. He was 21 years old. For fear of retaliation, he told no one about the abuse for 30 years.

  

After being honorably discharged with the rank of sargeant, he served in the Army National Guard for 7 years, from 1998 – 2005. During that time, his unit was sent to Louisiana after Hurricane Katrina and John received the Louisiana Emergency Service Medal and the Humanitarian Service Medal.

> 5. This award is being presented to you for outstanding support to the citizens of the State of Louisiana during Hurricane Katrina/Rita relief efforts. Your untiring devotion to duty has been invaluable. You have represented the embodiment of pride, professionalism, concern, and compassion during one of the worst disasters in Louisiana's history. Your actions and service are in the highest traditions of the National Guard.

In total, John served in the military for 20 years.

---

[1]      Undated photos of John Boslet in the U.S. Army.
[2]      Letter from Departments of the Army and Air Force to John Boslet dated January 5, 2006.

From 2002 – 2015, John served the Commonwealth of Pennsylvania as a state correctional officer.  He only left this position when he was federally indicted. From August 2015 – March 2019, John provided housekeeping services to the VA Hospital in Altoona through their Compensated Work Therapy program.  Following his guilty plea to the instant offense he resigned from the VA Hospital and began work as a groundskeeper at Alto-Reste Park Cemetery.  John has a strong employment history.

John lives in Altoona with his third wife. He met his first wife while stationed at Ft. Leonard Wood, MO. While he was deployed to Korea for a 6 month tour, she accumulated significant debt using his name - they soon divorced. John was later stationed in Korea for 5 years and married a woman he loved deeply. They divorced her 2 years later after she was unfaithful to him.

Nevada Boslet, John's third wife, served in the Army for 2 years. They met while both were stationed at Ft. Polk, married 6 months after meeting and soon became pregnant. Their first son, Jacob, is now 21 years old and serving in the U.S. Army like his father had. Their youngest child, Luke, is 18 and lives at home. Luke has significant needs – he has been diagnosed with Autism, Schizoaffective Disorder, and Major Depression.



*John, Nevada, Jacob, and Luke, undated.*

Luke was diagnosed with Asperger's Syndrome when he was 7 years old.[3]  He was psychiatrically hospitalized 3 times between August 2014 and January 2015. The last hospitalization happened after he pulled a knife on his brother. Luke reported to hospital staff extreme discord between himself and his mother and brother. In contrast, his psychiatric discharge summary noted "supportive father" as one of Luke's assets. Luke is currently diagnosed with Autism, Schizoaffective Disorder, and Major Depression.[4]  In high school, Luke attended a special school for children with his condition – he has since graduated and is living at home with his parents.

---

[3]      "Asperger syndrome (AS) is a developmental disorder.  It is an autism spectrum disorder (ASD), one of a distinct group of neurological conditions characterized by a greater or lesser degree of impairment in language and communication skills, as well as repetitive or restrictive patterns of thought and behavior." https://www.ninds.nih.gov/disorders/all-disorders/asperger-syndrome-information-page

[4]      "Autism spectrum disorder (ASD) is a developmental disorder that affects communication and behavior." https://www.nimh.nih.gov/health/topics/autism-spectrum-disorders-asd/index.shtml
        "Schizoaffective disorder is a mental health condition that includes features of both schizophrenia and a mood disorder such as bipolar disorder or depression."   https://ghr.nlm.nih.gov/condition/schizoaffective-disorder
        "Major depression is one of the most common mental disorders in the United States. For some individuals, major depression can result in severe impairments that interfere with or limit one's ability to carry out major life activities."   https://www.nimh.nih.gov/health/statistics/major-depression.shtml

John and Nevada have remained married to co-parent their children, but they have not shared a loving marital relationship for many years. For as long as Jacob can remember, his father has slept on the couch.  According to him "we went through a lot of couches."  John woke up in the living room, drove 45 minutes to his job at SCI Smithfield, worked his shift as a correctional officer, drove 45 minutes back to Altoona, spent time with his sons, then went back to sleep in the living room. Jacob believes John did everything he could for his sons.

Feeling lonely and isolated, John sought companionship online. He chatted with other adult women until Nevada caught him. Then he joined an online community with other lonely, isolated men. They talked about sexual taboos and exchanged images of "underage females in various 'modeling' poses ... clad in underwear and or swimwear." PSR ¶10.

Around the same time John joined the online community, he also sought treatment for Major Depressive Disorder, Recurrent at the VA Medical Center. He participated in individual counseling, biweekly Depression Group, and medication management, to address symptoms of depression and anxiety, very low self-esteem, a lack of confidence, and intense loneliness.  It was during this time John committed the instant offense.

Upon discovery of John's online activity, law enforcement went to his home in August of 2013.  He was not at home but with his wife's consent, they previewed his computer and found no child pornography.  The agents left only to return later that evening after John came home from work.  When the agents spoke with John, he

confessed – he admitted his possession of child pornography and identified the names of other men he traded the images with.  In full cooperation, John consented to let Homeland Security assume control of his email account.  Some images on John's computer showed adult men having sex with prepubescent girls. The agents found more than 150 but less than 300 images.  John was not arrested that day and the agents left.

More than a year later, during his treatment at the VA, John opened up to his therapist about the military sexual trauma he experienced 30 years prior and its lasting effects on his life – this trauma was discussed with his therapist for years during subsequent counseling sessions.

```
SUBJECTIVE: ASSESSMENT OF MOTIVATION TO ACHIEVE TREATMENT PLAN GOALS:
"I'm having really really bad Army dreams...They are mentally stressful to
me...the yelling and mental abuse and I have that feeling of helplessness in the
dream."

included in a future session.  He related that he was talking with an old
friend, Mike, and had disclosed what happened to him in the military.  He said
"Mike thought I never told him about the abuse because I just didn't think about
it for 30 years. I told him it was the opposite, that I thought about it every
day. The more I thought about it the more I bottled it up.  Regarding his legal
```
[5]

---

[5]      VAMC records, June 27, 2018.

Then in 2015, a year and a half after agents came to his home and he confessed, John was indicted on the current federal charge. The next day, he slashed his wrists and throat. *See* PSR ¶19.



On March 1, 2016, less than a year after he was indicted, John enrolled himself in treatment at Project Point of Light, a program that specializes in the assessment and treatment of sexual offenders which is approved through the Sexual Offenders Assessment Board and which follows the guidelines established by the Association for the Treatment of Sexual Abusers.  By December of 2018, he had completed all 4 phases of treatment, participating in group therapy, regular homework assignments, and education about cycles of deviance, lifetime management plans and relapse prevention.  He attended the program at his own expense for 2.5 years, with sessions in the first four phases occuring every week, approximately 52 weeks a year.

To be considered "successfully discharged" from the Project Point of Light program, John would have to complete and pass a discharge polygraph and a discharge interview. The polygraph costs $400 and the interview costs $60.  After

saving up and paying $55 toward the polygraph over several weeks, John concluded that he would not be able to afford the final polygraph before his sentencing hearing and asked for a refund.

On January 7, 2019, the Veterans Administration determined that John is in fact 50% service connected disabled due to trauma from military sexual assault.

| Medical Description | Percent (%) Assigned | Effective Date |
|---|---|---|
| Specified trauma and stressor related disorder, due to military sexual assault, previously acquired psychiatric condition | 50% | Aug 24, 2015 |

[6]

As part of his regimene of mental health treatment, John received trauma informed therapy at the VA Hospital for two years.  He successfully completed his treatment on January 22, 2019.

Certificate of Completion

is hereby granted to

John F. Boslet

to certify that he/she has completed to satisfaction

Skills Training for Affective and Interpersonal Relationships, a Trauma-informed Treatment

Granted: January 22, 2019

Martina B. Laurito, LCSW, BCD

---

[6]      Letter from Department of Veterans Affairs to John Boslet dated January 7, 2019.

On August 21, 2019, 6 years and 13 days after John Boslet admitted to federal agents that he possessed child pornography, he will be sentenced by this Court. In the past 6 years, John has not been arrested for a new crime. He has not had any contact with the police. He has not violated any pre-trial services supervision rules. He has not been given any drug tests because he has no history, or suspicion, of any drug use. He has not used the Internet.

He has, on his own, participated in sex offender treatment. He has, on his own, participated in mental health counseling and complied with medication management. He has, on his own, participated in work therapy and trauma treatment.

He's already rehabilitated. For these reasons, and those set for below, a downward variance is warranted.

## II.     SENTENCING CONSIDERATIONS:[7]

### **Step One**: Calculate the Guidelines Range.

---

[7]     At sentencing, post-*Booker*, district courts are required to follow a three-step sentencing process:

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-Booker case law, which continues to have advisory force.
> (3) Finally, they are required to exercise their discretion by considering the relevant [18 U.S.C.] § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (internal quotation marks, citations, and alterations omitted).

Mr. Boslet has no objection to the advisory Guidelines range as calculated in the PSR.

**Step Two**: **Rule on Departure Motions.**

Mr. Boslet does not submit a motion for downward departure.

**Step Three**: **Consider the § 3553(a) Factors.**

Pursuant to 18 U.S.C. § 3553(a), Mr. Boslet makes a motion for downward variance from the advisory Guidelines range.  He does so based on 1) the nature and circumstances of the offense; 2) his history and characteristics – specifically his mental and emotional condition, his post-offense rehabilitation, his family ties and responsibilities, his remorse, his lack of criminal history, his susceptibility to abuse in prison, and his life of public service; 3) the fact that the advisory sentencing guidelines for these types of cases are flawed and deserve little weight; and 4) the need to avoid unwarranted sentencing disparities.

**A.     A downward variance is warranted based on the nature and circumstances of the offense:**

In this case, Mr. Boslet possessed more than 150 but less than 300 images. *See* PSR ¶38.  In total, he possessed so few images it resulted in the second-lowest enhancement for number of images possible under the sentencing Guidelines, a rarity in federal court.  *See* U.S.S.G. 2G2.2(b)(7).  There is no information that Mr. Boslet engaged in any online chats with a child nor that he attempted to lure any children.  The investigation of Mr. Boslet began upon discovery that he posted

statements and images online of young girls in modeling poses.  When confronted, he confessed and turned over his computer and email account information.

In effect, the circumstances of this case involve a lonely and severely depressed man who was in a loveless marriage.  He initially went online and chatted with adult women.  After being caught by his wife, he resorted to other websites where he found other people posted images of minors, who posted discussions about them, and he regrettably partook.   In the end, he possessed very few images of child pornography and he has admitted his guilt for his conduct.

Given the facts and circumstances of this case, a downward variance is warranted.

### B.    A downward variance is warranted given Mr. Boslet's history and characteristics:

John Boslet is 54 years old.  He lives in Altoona, PA with his wife and his 18 year old son who has a number of significant mental health disorders.  He is a 20-year veteran.  His other son followed in his footsteps and is currently enlisted in the U.S. Army.  For the reasons that follow, Mr. Boslet's history and characteristics support a downward variance.

<u>Mental and emotional condition</u>:

Mr. Boslet has a significant mental health history as well as series of traumatic events for which he has received years of treatment (and continues to do so) which are relevant to sentencing.

His history includes a significant family history of mental illness - his parents, his aunt, and his grandmother all suffered from mental health disorders. In 1995 he was diagnosed with anxiety and depression.  He has and continues to take mental health medication every day.  The most stark example of his fragile mental health are the significant scars on his neck and wrists from when he attempted suicide following the indictment in this case.

In combination with the mental health disorders he has experienced significant trauma in his lifetime.  Initially he groomed by his priest when he was 13 years old, although no sexual contact occurred.  But later in life, and more significantly, he was repeatedly sexually assaulted by his commanding male officer when he was 21 years old and enlisted in the U.S. Army.  He told no one of either experience for more than 30 years.

He has since received years of treatment for depression and trauma at the VA Hospital in Altoona.  And he has a 50% service connected disability due to trauma from military sexual assault.

Numerous Courts have varied based on defendant's mental health and ongoing treatment.  *See e.g. United States v. Autery,* 555 F.3d 864 (9th Cir. 2009) (where defendant convicted of possession of child pornography and where guidelines 41-51 months, court's *sua sponte* variance to probation not unreasonable in part because of district court's determination that incarceration "would undermine" defendant's rehabilitation and that "probation with psychiatric treatment was a more appropriate sentence" than incarceration); *United States. v Polito,* (5th Cir.

Jan. 31, 2007) 2007 WL 313463 (unpub.) (where defendant convicted of possession of child pornography and guidelines 27-33 months, district court's sentence of probation with one year house arrest reasonable in part because "a term of imprisonment would interrupt Polito's mental health treatment").

Like those cases, Mr. Boslet's mental and emotional condition and ongoing treatment are bases that warrant a sentence below the advisory Guidelines range.

Post-offense rehabilitation:

Mr. Boslet committed the instant offense over 6 years ago. In that time, he has had no infractions while on pre-trial release. He has committed no crimes. He has not accessed the Internet. He has maintained employment. He has, on his own, sought mental health treatment and medication for his depression. He has, on his own, sought, received, and completed a two-year trauma therapy program at the VA Hospital. He has, on his own, enrolled in and completed four phases of Sex Offender Treatment at Project Point of Light, at his own expense, and which he attended weekly for 2.5 years.

Courts have found such extraordinary post-offense rehabilitation to be a basis for a below Guidelines range sentence. *See e.g. United States v. Shasky,* 939 F.Supp. 695 (D.Neb. 1996) (in possession of child pornography case, below Guidelines range sentence imposed based in part on defendant's extraordinary post offense efforts at rehabilitation including attendance at sex offender treatment program).

Mr. Boslet's efforts at post-offense rehabilitation are relevant to sentencing and warrant a downward variance.

Family ties and responsibilities:

Mr. Boslet lives with his wife and his son, who has Asperger's Syndrome, Schizoeffective Disorder, and Major Depression. His son has gone to a school specifically designed for children with these afflictions. His son has been hospitalized on numerous occasions for this mental health condition. His son has, at times, acted out violently. Mr. & Mrs. Boslet have remained married, albeit unhappily, to co-parent their son. To this day, Mr. Boslet continues to care for him. When hospitalized, his son identified the discord he experienced with his mother and brother but did identify a single person, his father, as being positive support of him.

Courts have sentenced below the Guidelines in cases involving strong family ties and responsibilities. *See e.g. United States v. Pauley,* 511 F.3d 468 (4th Cir. 2007) (where client pled to possession of child porn. and guidelines 78-97 months, court's downward variance to 42 months affirmed in part because defendant "is a good parent" which is a "valid consideration under § 3553(a)").

Mr. Boslet's family ties and responsibilities to his son are relevant to sentencing and warrant a below Guidelines sentence.

Remorse:

Mr. Boslet will address this Court at the time of sentencing and will express his remorse for his conduct. Numerous courts have determined, in cases like Mr.

Boslet's, that an expression of genuine remorse is a basis for a downward variance. *See e.g. Pauley,* 511 F.3d 468 (where client pled to possession of child pornography and guidelines 78-97 months, court's downward variance to 42 months affirmed in part because he was "deeply remorseful" and "appropriate consideration" under the statute as reflects his "history and characteristics"); *United States v. Stall,* 581 F.3d 276 (6th Cir. 2009) (in child pornography case where guidelines 57-65 months, court's sentence of 1 day in jail, 10 years supervised release, and one year house arrest, not unreasonable in part because of defendant's " exceptional expression of remorse [at the time of his arrest and thereafter] , immediate cooperation with the investigation, commitment to counseling, and demonstrated promise for rehabilitation."); *United States v. Wachowiak,* 412 F.Supp.2d 958 (E.D. WI 2006) *aff'd* 496 F.3d 744 (7th Cir. 2007) (where 24 year old music student convicted of possessing child pornography, and where he is in treatment and low risk of recidivism, and strong support from family, court granted a 51 month downward variance in part because 3 level reduction under U.S.S.G. § 3E1.1 for acceptance "did not sufficiently account for defendant's sincere expression of remorse and demonstration of insight into his condition and the harm he was causing children).

Mr. Boslet's remorse is relevant to sentencing and warrant a below Guidelines sentence.

Lack of criminal history:

Prior to this case, Mr. Boslet had no criminal history and had never been arrested. *See* PSR ¶¶39-43. Numerous Courts have found lack of criminal history to

be a basis for a below Guidelines sentence. *See e.g. Autery,* 555 F.3d 864 (where possession of child pornography case and where guidelines were 41-51 months, court's *sua sponte* variance to probation not unreasonable in part because defendant's first conviction and Criminal History Category I "did not fully account or his complete lack of criminal history" because defendant with minor criminal history still falls in category I); *United States v. Huckins* (10th Cir. 2008) 529 F.3d 1312 (where defendant convicted of possession of child porn and guidelines 78-97 months, court's variance to 24 months proper in part because this was defendant's first conviction --rejecting government's argument that guidelines already considered this by placing defendant in Criminal History Category I. "Although the Guidelines discourage granting a downward departure based upon criminal history when the defendant has been placed in a criminal history category of I ... this is a not a departure case, it is a variance case....and, after *Gall* and *Kimbrough*, a factor's disfavor by the Guidelines no longer excludes it from consideration under § 3553(a).... Therefore, a district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into a criminal history category of I, in its § 3553(a) analysis.").

Mr. Boslet's lack of criminal history is relevant to sentencing and warrants a below Guidelines sentence.

Susceptibility to abuse in prison:

Mr. Boslet worked for the Pennsylvania Department of Corrections as a correctional officer for 12 years. *See* PSR ¶61. His prior position, in combination

with being a convicted sex offender, unquestionably makes him a vulnerable individual should he be incarcerated.  Numerous Courts have considered susceptibility to abuse in prison as a basis for a below Guidelines range sentence. *See e.g. Shasky,* 939 F.Supp. 695 (downward departure for receiving material via computer involving pornographic images of minors, as case was outside "heartland" due to in part to defendant's unusual susceptibility to abuse in prison; defendant was homosexual state trooper of diminutive stature and weight);  *United States v. Volpe,* 78 F.Supp.2d 76, 89 (E.D.N.Y.1999) ("Volpe II") (Defendant entitled to two-level departure because "[t]he extraordinary notoriety of this case and the degree of general opprobrium  toward Volpe . . . , coupled with [his] status as a police officer," left him "unusually susceptible to abuse in prison" and D may have to spend most his time in segregation); *United States  v. Bruder*, 103 F.Supp.2d 155, 182 (E.D.N.Y. 2000) (same).

Mr. Boslet's susceptibility to abuse in prison is relevant to sentencing and warrants a below Guidelines sentence.

Life of public service:

Mr. Boslet was in the United States Army for 13 years.  According to his DD Form 214, he was honorably discharged and received the following decorations during his years of service: "Army commendation medal (6th award), Army achievement medal (4th award), Army lapel button, Army good conduct medal (2nd award), National defense service medal, Noncommissioned officer's professional development ribbon with numeral 2, Army service ribbon, Overseas service ribbon

(3rd award), and Nato medal." He was also in the Army National Guard for 7 years – in total, he has 20 years of military service. He was also a corrections officer for 12 years for the Commonwealth of Pennsylvania. *See* PSR ¶61. He then worked for the Veteran's Administration Hospital for almost 4 years. *See* PSR ¶60. His life has been one filled with decades of public service and service to his country.

Courts have repeatedly granted below Guidelines sentences to veterans. *See e.g. Porter v. McCollom,* 558 U.S. 30, 130 S.Ct. 447 (2009) ("Our Nation has a long tradition of according leniency to veterans in recognition of their service); *United States v. Howe,* 543 F.3d 128  (3d Cir. 2008) (where defendant convicted of mail fraud  with loss of $150,000 and guidelines 18-24 months, sentence of probation with 3 months home detention not unreasonable in part because of Howe's twenty years of military service followed by honorable discharge.); *see also United States v. Carter*, 530 F.3d 565 (7th Cir. 2008)  ("The guidelines are one factor among those listed in 18 U.S.C. § 3553(a), and regardless of whether courts have previously recognized public service as a ground for departure from the Guidelines, sentencing courts are charged with considering as part of the § 3553(a) factors "the history and characteristics of the defendant," which would include a defendant's public service. § 3553(a)(1).

Mr. Boslet's decades of public service are relevant to sentencing and warrant a below Guidelines sentence.

**C.    The Guidelines' ranges for child pornography offenses are flawed and far greater than necessary.  Given this, a downward variance is warranted.**

The advisory guideline range in Mr. Boslet's case recommends he spend 78-97 months (i.e. 6.5 – 8+ years) in federal prison as a first-time offender who possessed more than 150 but less than 300 images and who did not have sexual contact with a child.  A sentence within this range would be absurd given the facts and circumstances of this case and of Mr. Boslet.

Numerous courts have found the advisory sentencing guidelines for child pornography offenses fail to reflect the proper consideration of *all* of the relevant factors, both offense and offender specific, at sentencing and provide for sentences *far greater than necessary* to achieve the purposes of sentencing, violating the parsimony mandate of 18 U.S.C. § 3553(a).  *United States v. Grober*, 624 F.3d 592 (3d Cir. 2010) (collecting cases).

In *Grober*, the Court of Appeals affirmed a downward variance from an advisory sentencing guideline range of 235-293 months to the mandatory minimum of 60 months – **a variance 74% less than the low-end of the Guidelines limited from going further down by the mandatory minimum.**  In doing so, the Circuit Court specifically affirmed the district court's reliance on its conclusion that United States Sentencing Guidelines, § 2G2.2 was not based upon empirical data, and that most of the enhancements in § 2G2.2 are "inherent in the crime and, thus, apply in nearly every case." *Grober*, 624 F.3d at 597.  Before *Grober* the Third Circuit held that "a Guideline is likely to reflect a rough approximation of sentences

that might achieve § 3553(a)'s objectives only when it is the product of empirical data and national experience, guided by a professional staff with appropriate expertise." *United States v. Arrelucea-Zamudio*, 581 F.3d 142, 155, n. 12 (3d Cir. 2009), *quoted in*, *Grober*, at 608.  Indeed, the Third Circuit noted that "numerous district courts around the country [have] similarly found § 2G2.2 flawed." *Grober*, at 603, citing, *United States v. Diaz*, 720 F. Supp.2d 1039, 2010 WL 2640630 (E.D. Wisc. 2010)(collecting cases); *United States v. Riley*, 655 F. Supp.2d 1298 (S.D. Fla. 2009); *United States v. McElheney*, 630 F. Supp.2d 886 (E.D. Tenn. 2009); *United States v. Beirmann*, 599 F.Supp.2d 1087 (N.D. Iowa 2009); *United States v. Phinney*, 599 F. Supp.2d 1037 (E.D. Wisc.  2009).

Indeed, in Mr. Boslet's case the offense level is dramatically increased by two factors: 1) specific offense characteristics that apply in every case; and 2) specific offense characteristics that apply in Mr. Boslet's case.  Each will be addressed in turn.

First, Mr. Boslet's sentencing Guidelines range is increased by 8-levels based on three specific offense characteristics that apply in virtually every case – prepubescent minor, S&M, and use of computer.  According to the most recent sentencing statistics, of all sentences under § 2G2.2 in 2017, 94.1% involved application of an enhancement for prepubescent minor (qualifying for a 2-level increase...), 95.7% involved application of an enhancement for use of a computer (qualifying for a 2-level increase...), and 71.2% involved application of an enhancement for possessing an image depicting sadistic or masochistic conduct or

other forms of violence (qualifying for a 4-level enhancement...).  *See*

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-

sentencing-statistics/guideline-application-

frequencies/2017/Use_of_SOC_Guideline_Based.pdf  Mr. Boslet's offense level is

increased 8-levels based on these enhancements, which statistically apply in

virtually every case.  This is not the true purpose of specific offense characteristics.

Rather, they "are meant to increase a sentence for conduct more aggravated than the

typical type of offense." *United States v. Robinson,* 669 F.3d 767, 778 (6th Cir. 2012).

Whereas here, the specific offense characteristics statistically apply in virtually

every case, they become meaningless.

  The Sentencing Commission explains that "guidelines take account of a

number of important, commonly occurring real offense elements such as role in the

offense, the presence of a gun, or the amount of money actually taken, through

alternative base offense levels, specific offense characteristics, cross references, and

adjustments." United States Sentencing Commission Guidelines Manual at 6 (Nov.

1, 2018). Yet, as is the case here, when enhancements under a Guideline cease to

reflect the relative culpability of the offender, they are dubious and should be

carefully scrutinized. The Second Circuit very recently explained that the

Commission "has effectively disavowed § 2G2.2" because it can "easily generate

unreasonable results." *United States v. Jenkins,* No. 14-4295-cr (2d Cir. Apr. 17,

2017), at 13. The Department of Justice agreed, stating that "the existing Specific

Offense Characteristics ('SOCs') in USSG [Section] 2G2.2 may not accurately reflect

the seriousness of an offender's conduct, nor fairly account for differing degrees of offender dangerousness." Department of Justice Letter to the USSC on the Child Pornography Report at 1 (March 5, 2013), available at http://fsr.ucpress.edu/content/25/5/345.

**Without application of these "meaningless" 8-levels (that apply in virtually every case), Mr. Boslet's advisory Guidelines range would be 33-41 months.** *See* U.S.S.G., Chpt. 5, Part A. Sentencing Table.

Second and finally, Mr. Boslet's offense level is also increased by three-levels as he possessed more than 150 but less than 300 images. This too is an artificial inflation to his offense level. As Chief Judge Joseph F. Batallion of the District of Nebraska recognized, "there is essentially no Internet child pornography offender who could end up with a recommended sentence at the low end of the statutory range." *United States v. Strayer*, 2010 WL 2560466, *11 (D. Neb. June 24, 2010). *See also United States v. Howard*, 2010 WL 749782, *10 (D. Neb. March 1, 2010) (same). "[E]nhancements for use of a computer and for the number and type of images apply in virtually every case." *Id.* Indeed, "[t]he Internet has become the typical means of obtaining child pornography, and Internet child pornography cases are essentially the only kind of child pornography crime prosecuted in federal court." *Id.* Thus, the "enhancements for use of a computer and number of images lack value as a reliable proxy for culpability and are a poor gauge of relative levels of fault between offenders." *Id.*

The Second Circuit has described the two-level computer enhancement as having the "flavor of impermissible 'double counting'-because it effectively increase[s] a defendant's sentence to reflect the kind of harm that has already been fully accounted for' by the base offense level or other enhancements." *United States v. Tutty,* 612 F.3d 128, 132 (2d Cir. 2010) (citation omitted).

Similarly, "[b]ecause of the unfortunate ease with which large numbers of images can be accessed and stored, most child pornography offenders are subject to enhancements from two to five levels for the number of images." *Howard*, 2010 WL 749782, *10; *see also United States v. Hanson*, 561 F. Supp.2d 1004, 1009 (E.D. Wis. 2009) ("given the unfortunate ease of access to this type of material in the computer age, compiling a collection with hundreds of images is all too easy, yet carries a 5 level enhancement").  Unlike quantity-based enhancements in a drug-distribution scheme, in child pornography cases, "the number of images does not provide the distinction between a large-scale and a small-scale child pornography purveyor that Congress and the Sentencing Commission must have envisioned when promulgating this market-based and quantity-driven scheme."  *Howard*, 2010 WL 749782 at *10. Rather, "the number of images a defendant possesses is meaningless as an indicator of his position in a distribution hierarchy."  *Id.*  "Whatever connection there may be between a defendant's relative guilt and the number of images he possesses, an enhancement of up to five levels overstates that connection."  *Id.*

**Without application of the number of images enhancement, Mr.**

**Boslet's range would be even further reduced down to 24-30 months.** *See*

U.S.S.G., Chpt. 5, Part A. Sentencing Table.

Application of these enhancements – in specific offense characteristics that apply in virtually every case and in number of images - results in a guideline range which suggests that this Court imprison Mr. Boslet, who has a no criminal history, to a term of incarceration (without the possibility of parole) ranging from six and a half to more than eight years. Without any or even some of them, his Guidelines range would be two years.

The Third Circuit has noted that the Commission made these Congressionally mandated increases "sometimes reluctantly," noting the Commission's criticism of the two level increase for use of a computer, which applies in virtually all cases, and "its general statement that "specific directives to the Commission to amend the guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress." *Grober*, 624 F.3d at 607.  The Third Circuit further noted that in the 2009 Report the Sentencing Commission "identified a review of the child pornography Guidelines as a policy priority," and observed that "for the past several years, § 2G2.2 has a high and increasing rate of downward departures and below-guideline variances." *Grober*, 624 F.3d at 606.

Based upon the 8-level increase of Mr. Boslet's offense level due to "meaningless" enhancements that statistically apply in nearly every case and based

on the "all too easy" 3-level increase for number of images, and based on the Third

Circuit's criticisms and Sentencing Commission's criticisms of USSG, § 2G2.2, the

very significant advisory sentencing guideline range in this case of 78-97 months

should be given very little weight by the Court and, instead, a downward variance

should be granted.

> **D.    A downward variance would satisfy the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct.**

Numerous courts have sentenced offenders similarly situated to Mr. Boslet

below the advisory Guidelines range, including to probation.  To begin with, the

Third Circuit affirmed a sentence 74% below the Guidelines range to the mandatory

minimum in *Grober* where that defendant pled guilty to six counts including

transportation of child pornography, receipt of child pornography, and possession of

child pornography where the advisory Guidelines range recommended 235-293

months imprisonment despite him being a criminal history category I.  *See Grober*,

624 F.3d at 596 (in that case, the defendant possessed 1500 images and 200 videos).

In addition to *Grober,* there are numerous examples in the country of

offenders being sentenced in federal court to either probation or only days in

custody when charged with the non-mandatory offense.  There are many examples

alone in the federal district courts' in the state of Pennsylvania.  *See e.g. United*

*States v. Ryan Kanarr,* 17-CR-248 (E.D. Pa. 2018)(house arrest for transgender man

with mental health issues who was on testosterone and hypersexual at time of

offense, faced obvious difficulties if imprisoned and demonstrated significant post-

offense rehabilitation); *United States v. R.O.*, 16-CR-188 (E.D. Pa. 2016); *United States v. Bryer,* No. 13-cr-96 (W.D. Pa. 2015)(one day incarceration followed by fourteen months home detention); *United States v. D.M.M.*, 15-CR-476 (E.D. Pa. 2015)(sentence of one day of incarceration followed by six months of house arrest with electronic monitoring); *United States v. A.F.,* 12-CR-256 (E.D. Pa.2012)(one day incarceration for client who was 72 years old); *United States v. Graci,* No. 2:09-CR-00131 (E.D. Pa. 2009) (defendant, a former elementary school teacher, purchased access to child pornography websites on three different occasions); *United States v. Rubino,* No. 4:08-CR-00114 (M.D. Pa. 2009) (defendant was a mentally challenged man with prior drug convictions who possessed 25 disks containing child pornography); *United States v. Butler,* No. 1:07-CR-00466 (M.D. Pa. 2008) (defendant was in his sixties with no prior criminal conduct).

Outside of Pennsylvania, there are examples of probationary sentences where the defendant, like Mr. Boslet, had a history of being a victim of sexually assault. *See e.g. United States v. Malakoff,* No. 1:09-CR- 00051 (D.D.C. 2009) (defendant was sexually abused as a child and suffers from post-traumatic stress disorder); *United States v. Hall,* No. 12-CR-20119 (W.D. Tenn. 2013) (as corrected on Feb. 20, 2013) (sentenced to time served (one day) followed by ten years of supervised release, with five years on home confinement, where defendant had been sexually abused as a child, suffered from serious medical problems and depression, and had a long work history); *United States v. Rhoads,* No. 12-CR-40078 (D. Kan. 2013) (sentenced to five years' probation (guideline range of 97-121 months) where defendant was 18-19

years old at the time of the offense, was a victim of childhood abuse, and was successfully undergoing outpatient sex offender treatment); *United States v. Teays,* No. 09-CR-532 (E.D. Cal. 2012) (sentenced to five years' probation where defendant had been the victim of sexual abuse as a child, was socially withdrawn, and had been undergoing successful counseling); *United States v. Saenz,* No. M-05-CR-877 (S.D. Tex. 2011) (defendant had been abused as a child, served five years of home confinement, and never acted out; he possessed 126 images, including those of boys being raped);  *United States v. Guismondi,* No. 07-CR-00610 (E.D.N.Y. 2009) (developmentally disabled defendant who was victim of sexual abuse);  *United States v. Hill,* No. 08-CR-00208 (W.D. Okla. 2009) (defendant had been sexually abused, obtained and shared images through file-sharing);  and *see United States v. Meillier,* 650 F. Supp. 2d 887 (D. Minn. 2009) (defendant was mentally disabled and had been the victim of sexual abuse);

Given the sentences in like cases, a downward variance is warranted here.

## III.   CONCLUSION:

For the reasons stated above, Mr. Boslet respectfully requests a downward variance from the advisory Guidelines range.

Respectfully submitted,

**S\ Christopher B. Brown**
Christopher B. Brown
Assistant Federal Public Defender
PA I.D. No. 85117